J-S37028-25
J-S37029-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: Z.N.E.E., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: Y.E., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1729 EDA 2025 |

Appeal from the Order Entered June 9, 2025
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-DP-0000237-2023

| | | |
|---|---|---|
| IN THE INTEREST OF: Z.N.E.E., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: Y.E., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1730 EDA 2025 |

Appeal from the Decree Entered June 9, 2025
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-AP-0000196-2025

| | | |
|---|---|---|
| IN THE INTEREST OF: Z.N.E.E., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: P.E., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1448 EDA 2025 |

Appeal from the Decree Entered June 10, 2025
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-AP-0000196-2025

J-S37028-25
J-S37029-25

BEFORE:   DUBOW, J., KUNSELMAN, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY KUNSELMAN, J.:                    **FILED JANUARY 13, 2026**

In these matters, P.E. (Father) and Y.E. (Mother) appeal from the decrees that terminated their parental rights to their now ten-year-old daughter, Z.N.E.E. (the Child), pursuant to the Adoption Act. ***See*** 23 Pa.C.S.A. § 2511(a)(1), (a)(2), (a)(5), (a)(8), and (b).[1]  Because each parent's appeal raises substantially the same issues and involves the same facts and circumstances, we address the parents' appeals together in one decision.  After review, we affirm.

We discern the following factual and procedural history from the certified record.  In March 2023, the Philadelphia Department of Human Services (the Agency) received a report due to the family's home being in deplorable condition.  ***See*** N.T., 6/9/25, at 23.  The home was unsafe to walk into, had a hole in the porch, no running water, no working toilets, wires hanging from

_____

[*] Former Justice specially assigned to the Superior Court.

[1] The orphans' court also changed the goal of the dependency proceedings. Mother initially appealed the goal change along with the termination.  This Court consolidated her appeals *sua sponte* on July 31, 2025.  However, it appears Mother has abandoned any argument related to the goal change on appeal because she only makes arguments related to the termination in her brief.  ***See generally*** Mother's Brief at 19-34.  Regardless, had Mother attempted to make a goal change argument on appeal, it would have been waived because she did not raise any issues related to the goal change in her Appellate Rule 1925(b) statement.  Father did not appeal the goal change. Thus, we will only address the termination decrees in this decision.

- 2 -

the ceiling, no beds for the children,[2] and no food. *See id.* at 8-9, 18, 23.

There was also black mold and urine and feces in the home. *See id.* The

children were not registered for school, and their medical needs were not

being met. *Id.* at 23. Thus, the children were removed from the home. *Id.*

The Child was subsequently adjudicated dependent. As of the termination

hearing, the Child was in a treatment level, foster-care home, where she had

lived for over a year and a half, since October 2023. *Id.* at 24, 42.

Father's single case plan objectives included: obtaining and maintaining

appropriate housing; having visits with the Child; participating in Behavioral

Health services; participating in art classes; completing a parenting capacity

evaluation; contacting the intellectual disability services (IDS) office; and

complying with the Community Umbrella Agency (CUA) and all court orders.

*See id.* at 25. Mother's single case plan objectives included: participating in

Behavioral Health; having visits with the Child; participating in parenting

classes; obtaining and maintaining appropriate housing; contacting the IDS

office; and completing a parenting capacity evaluation. *See id.* at 49. The

CUA case managers made Father and Mother aware of their objectives, at

least once a month. *See id.* at 25, 49, 60-61, 71.

On April 28, 2025, more than two years after the Child was removed,

the Agency filed petitions to involuntary terminate Father's and Mother's

_____

[2] The record reveals that Father and Mother have another child together, M.W., the Child's sibling, who was also living in the home. That child is not involved in this appeal. Thus, we focus our analysis solely on the Child, Z.N.E.E.

parental rights and to change the Child's permanency goal to adoption. The orphans' court held a termination hearing on June 9, 2025. The parenting capacity evaluator, the former and current CUA case managers, Mother, and Father testified. At the end of the hearing, the orphans' court involuntarily terminated Father's and Mother's parental rights to the Child.

Father and Mother timely filed these appeals.[3] We will address Father's appeal first. Father presents the following five issues for our review:

1. Whether the trial court erred and/or abused its discretion by terminating the parental rights of Father, P.E. pursuant to 23 Pa.C.S.A. Section 2511(a)(1), where Father presented evidence that he was substantially compliant with his SCP goals and was not permitted to perform parental duties.

2. Whether the trial court erred and/or abused its discretion by terminating the parental rights of Father, P.E. pursuant to 23 Pa.C.S.A. Section 2511(a)(2), where Father presented evidence that he has worked to remedy his situation and will have present capacity to care for his child.

3. Whether the trial court erred and/or abused its discretion by terminating the parental rights of Father, P.E. pursuant to 23 Pa.C.S.A. Section 2511(a)(5), where evidence was provided to establish that the Child was removed from the care of the Father and Father would be capable of caring for his child with all necessary service and supports.

_____

[3] The Child's Guardian *ad litem* (GAL) and counsel failed to file briefs or otherwise notify us of their position in this matter. We surmise from the GAL's representation to the orphans' court at the end of the termination hearing that he believed adoption was in the Child's best interest. **See** N.T., 6/9/25, at 105. Similarly, we surmise from the Child's legal counsel's representation that the Child wished to remain in her foster home, wanted to make that her "permanent forever home," and did not want to have contact with her parents. **See id.** at 99-100. Nevertheless, we remind the GAL and counsel that their duties to the Child extend through any appeals.

4. Whether the trial court erred and/or abused its discretion by terminating the parental rights of Father, P.E. pursuant to 23 Pa.C.S.A. Section 2511(a)(8), where evidence was presented to show that Father would be capable of caring for his child with the additional supports and services.

5. Whether the trial court erred and/or abused its discretion by terminating the parental rights of Father, P.E. pursuant to 23 Pa.C.S.A. Section 2511(b), where evidence was presented that established the Child had lived with her Father for part of her life and Father maintained that parental bond by visiting with his child when he was permitted to visit.

Father's Brief at 7 (cleaned up).

We begin with our well-settled standard of review:

> The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Our Supreme Court has repeatedly stated that in termination cases, deference to the trial court is particularly crucial. *In re Adoption of L.A.K.*, 265 A.3d 580, 597 (Pa. 2021); *see also Interest of S.K.L.R.*, 256 A.3d 1108, 1124 (Pa. 2021) ("When a trial court makes a 'close call' in a fact-intensive

case involving . . . the termination of parental rights, the appellate court should review the record for an abuse of discretion and for whether evidence supports that trial court's conclusions; the appellate court should not search the record for contrary conclusions or substitute its judgment for that of the trial court."). The abuse-of-discretion standard in termination cases "is a highly deferential standard and, to the extent that the record supports the court's decision, we must affirm even though evidence exists that would also support a contrary determination." **In re P.Z.**, 113 A.3d 840, 849 (Pa. Super. 2015) (citation omitted); **see also T.S.M.**, 71 A.3d at 267. Furthermore, the "trial court is free to believe all, part, or none of the evidence presented, and is likewise free to make all credibility determinations and resolve conflicts in the evidence." **In re M.G.**, 855 A.2d 68, 73-74 (Pa. Super. 2004) (citation omitted).

Clear and convincing evidence is evidence that is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." **In re C.S.**, 761 A.2d 1197, 1201 (Pa. Super. 2000) (*en banc*) (quoting **Matter of Adoption of Charles E.D.M., II**, 708 A.2d 88, 91 (Pa. 1998)).

Termination of parental rights is governed by Section 2511 of the Adoption Act, which requires a bifurcated analysis.

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants

> termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child . . . .

*In re C.M.K.*, 203 A.3d 258, 261-62 (Pa. Super. 2019) (citation omitted);

*see also Interest of M.E.*, 283 A.3d 820, 830 (Pa. Super. 2022).

Instantly, the orphans' court terminated Father's rights under Section 2511(a)(1), (a)(2), (a)(5), (a)(8), and (b). As we may affirm under any of the subsections of Section 2511(a), we review the court's decision as to Section 2511(a)(8). That subsection provides:

> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> > (8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

23 Pa.C.S.A. § 2511(a)(8).

To prove this subsection, the Agency must establish the following three elements: "(1) that the child has been removed from the care of the parent for at least twelve months; (2) that the conditions which led to removal or placement of the child still exist; and (3) that termination of parental rights would best serve the needs and welfare of the child." *M.E.*, 283 A.3d at 832 (citation omitted). Unlike other Section 2511(a) subsections, subsection (a)(8) "does not require the court to evaluate a parent's willingness or ability

- 7 -

to remedy the conditions that led to the placement" of the child. ***Id.*** (citation omitted). Instead, the relevant inquiry "is whether the conditions that led to removal have been remedied and thus whether reunification of parent and child is imminent at the time of the hearing." ***Id.*** (citation omitted).

Importantly, under this subsection, the court "shall not consider any efforts by the parent to remedy the conditions described [in the termination petition] which are first initiated subsequent to the giving of notice of the filing of the petition." 23 Pa.C.S.A. § 2511(b). This provision may seem harsh as it prohibits the court from considering the parent's recent progress. However, as this Court has explained:

> [B]y allowing for termination when the conditions that led to removal of a child continue to exist after a year, the statute implicitly recognizes that a child's life cannot be held in abeyance while a parent attempts to attain the maturity necessary to assume parenting responsibilities. The court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future. Indeed, we work under statutory and case law that contemplates only a short period of time, to wit [eighteen] months, in which to complete the process of either reunification or adoption for a child who has been placed in foster care.

***M.E.***, 283 A.3d at 832 (citation omitted).

Finally, although Section 2511(a) focuses generally on the parent's behavior, the third element of subsection (a)(8) centers on the child's needs, thereby encompassing the needs and welfare analysis typically reserved until the court's Section 2511(b) analysis. This Court has explained:

> [W]hile both Section 2511(a)(8) and Section 2511(b) direct us to evaluate the "needs and welfare of the child," we are required to resolve the analysis relative to Section 2511(a)(8), prior to addressing the "needs and welfare" of [the child], as proscribed by Section 2511(b); as such, they are distinct in that we must address Section 2511(a) before reaching Section 2511(b).

*In re E.J.C.*, 335 A.3d 1222, 1231 (Pa. Super. 2025) (citing *In re Adoption of C.L.G.*, 956 A.2d 999, 1009 (Pa. Super. 2008) (*en banc*)).

Here, at the end of the termination hearing, the orphans' court concluded that the Agency had proven, by clear and convincing evidence, the statutory grounds for termination under Section 2511(a)(8).[4] The court provided the following reasoning, in relevant part:

> I take no pleasure in reaching my decision today but the [Agency] has met its burden in warranting the involuntary termination of parents rights under [Section 2511(a)(1), (2), (5), (8), and (b)].
>
> This case has been now open for more than 28 months since the adjudication of April 24, 2023, and TPR petitions were filed on April 28, 2025. [. . .]
>
> [. . .]
>
> Under subsection [(a)(8)] [. . .]
>
> I do find [] clearly it's been more than 12 months since removal or placement. The conditions do continue to exist as expressed, and termination would best serve the needs and welfare of [the Child] to free her for adoption which is what the [C]hild wants and which I find in her best interest.

_____

[4] We note that, on appeal, the orphans' court relied on the reasons it stated on the record to support its termination decrees, rather than filing an Appellate Rule 1925(a) opinion.

- 9 -

N.T. at 107, 13.

On appeal, Father argues that terminating his parental rights under Section 2511(a)(8) was improper because he had cooperated with CUA. Father's Brief at 17. Father claims that he was never provided with reasonable efforts to reunify him with the Child. *See id.* Specifically, he was never referred for IDS. *Id.* According to Father, had he been referred for IDS, he would have had the support necessary for reunification. *See id.* at 17-18. Additionally, Father claims he has made the necessary repairs to his home on his own. *Id.* at 18. Father asserts that once he is referred for the appropriate services, he *should* have the current capacity to care for the Child. *Id.* (emphasis added).

Father's argument fails to appreciate the standard of review we must apply to termination cases. We must accept the orphans' court's factual findings and credibility determinations if they are supported by the record. *See T.S.M.*, 71 A.3d at 267 (citation omitted). This is true even if the record could support an opposite result. *See id.*

Our review of the record supports the orphans' court's decision. The Child was removed from Father's and Mother's care in March 2023; the Agency filed its termination petitions in April 2025; and the termination hearing occurred in June 2025. *See* N.T. at 23; Order of Protective Custody, 3/14/23; Termination of Parental Rights Petitions, 4/28/25. Thus, more than 12 months had elapsed since the Child's removal.

The Child was removed from her parents' care mainly due to concerns with the family's house, the Child not being enrolled in school, and the Child's medical needs not being met. *See* N.T. at 23. Although Father claims that he made the requisite repairs to the house, the current CUA case manager testified that, at the time of the hearing, the house was not in a condition where the Child would be able to return safely to it. *Id.* at 64. The case manager stated that there were several holes in the walls and floor, things were hoarded in the house, and the house still needed plumbing and electrical work. *See id.* Further, for a time, there had been no working gas in the house. *See id.*

Although not argued by Father, we acknowledge that Section 2511(b) states that the "rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care *if found to be beyond the control of the parent*." 23 Pa.C.S.A. § 2511(b) (emphasis added). Nevertheless, here, Father's parental rights were not terminated solely based on his inadequate housing, nor did the court find that Father's inadequate housing was beyond his control. In fact, the former CUA case manager testified that Father did not meet the goal of obtaining appropriate housing at any time while she was the case manager, from October 2023 to January 2025. *See* N.T. at 23, 26. CUA made efforts to assist parents with getting a grant to help with home repairs. *See id.* at 26-27. However, the quote that Father gave the case manager

- 11 -

was not from a legal contractor in Philadelphia, and a requirement for the grant was that the contractor be licensed. ***See id.*** at 27. The case manager had a conversation with Father about the requirements for the quote. ***See id.*** Although Father told the case manager that he would get her a new quote, when she left the case in January 2025, he had not provided one. ***See id.*** CUA also discussed alternative housing options with Father. ***Id.*** at 29-30.

Father also did not meet his goal of engaging in Behavioral Health services. ***See id.*** at 36-37, 72-73. In fact, although Father claimed he was participating in therapy, the case manager later discovered that he only attended two therapy sessions from November to December 2024. ***See id.*** at 72-73. Father's testimony regarding mental health treatment was unclear, but he appeared to assert that he could not go to treatment because he was repairing the house. ***See id.*** at 95-96.

Regarding IDS, the former case manager testified that CUA tried to connect Father to the IDS office, but it needed documentation from Father to give the referral. ***See id.*** at 37. Father never completed what was necessary to engage in IDS. ***See id.*** at 41, 71-73. CUA also sent Father resources for an IQ evaluation. ***See id.*** at 38. The current case manager testified that Father's misrepresentation regarding therapy prevented CUA from getting the documentation that was needed for Father to get IQ testing and IDS. ***See id.*** at 71-73. Had Father been more forthcoming, the case manager could have directed the case differently. ***See id.*** at 73.

The evaluator who conducted a parenting capacity evaluation for Father testified that, in her opinion, Father did not possess parental capacity. *See id.* at 7, 11-12. Father did not adequately address his involvement in why the Child was removed. *See id.* at 14. He did not recognize his own contributions to the case, and he externalized responsibility for it. *Id.* at 15.

The current case manager testified that neither parent took accountability in the case, and the parents felt like the Child was coerced into making allegations about them and none of the allegations were true. *See id.* at 70. Further, several professionals that worked on the case testified to issues with Father's boundaries, *i.e.*, he made inappropriate comments to them or touched them while talking, which was concerning for reunification. *See id.* at 21, 35, 75.

The former case manager stated that she would rate Father's compliance with his objectives as "minimal." *Id.* at 41. She rated his progress with abating the circumstances that brought the Child into the Agency's care as "none." *Id.* Although Father claims he was not provided with reasonable efforts to assist with reunification, the former case manager testified that she did everything she could to assist Father and Mother in complying with their objectives, and there was nothing more that she could have done to help them. *See id.* at 56. Further, many orders entered in this case found that the Agency provided reasonable efforts. *See* Order of Adjudication and

Disposition, 4/24/23; Permanency Review Orders, 7/31/23, 10/3/23, 12/18/23, 3/4/24, 6/3/24, 9/04/24, 12/3/24, 3/3/25.

Thus, the record evidence supports the finding that the conditions which led to removal were not remedied and reunification between Father and the Child was not imminent at the time of the termination hearing, more than two years after the Child was removed. ***See M.E.***, 283 A.3d at 832 (citation omitted). We acknowledge that Father testified to contrary facts. Nevertheless, we reiterate that our role as an error-correcting appellate court does not include searching the record for contrary conclusions or substituting our judgment for that of the orphans' court. ***See S.K.L.R.***, 256 A.3d at 1124. When the record supports the orphans' court's decision, we must affirm even though evidence exists that would also support a contrary determination. ***See P.Z.***, 113 A.3d at 849 (citation omitted); ***see also T.S.M.***, 71 A.3d at 267. Therefore, we discern no error of law or abuse of discretion with the orphans' court's analysis of the first two elements of Section 2511(a)(8).

Regarding the third element of Section 2511(a)(8), the orphans' court determined that termination and freeing the Child for adoption best served her needs and welfare. It noted that adoption was what the Child wanted and what the court found to be in her best interest. ***See*** N.T. at 113.

The record supports the orphans' court's conclusion. As noted, the Child was in care for over two years prior to the termination hearing. Father's and Mother's visits with the Child were suspended in December 2023 because the

Child made sexual abuse allegations against Father, and she stated that she had told Mother, who had not reported it. *See id.* at 30-32, 50-51. The former case manager testified that she discussed visits with the Child every month, but the Child never felt comfortable to have visits. *See id.* at 40-41.

The case managers testified that they did not believe the Child could be safely returned to Father's care. *Id.* at 41, 75-76. Both case managers had ruled out reunification between Father and the Child and did not feel that the Child would experience irreparable harm from termination. *Id.* at 42, 76. The Child did not feel safe returning to Father, did not want communication with her parents, was very happy in her foster home, and was bonded with her foster parent and the other foster children in the home. *See id.* at 42, 70, 76, 78-79. The Child felt uncomfortable around her parents and wanted her wishes to be considered. *See id.* at 70. The case managers believed there was no parent-child relationship between the Child and Father. *Id.* at 42, 76. The Child had a healthy and good relationship with her foster parent, who she looked to for love, care, and advice and when she was sick, hungry, or hurt. *See id.* at 43-44, 78-79. The foster parent took the Child to her appointments, provided for her financially, and was willing to adopt her. *See id.* at 44, 79. The Child wanted to be adopted and did not want to return home, and the case managers believed that was in her best interest. *See id.* at 44-45, 79, 82.

Thus, the record supports the orphans' court's decision that termination best served the Child's needs and welfare. We discern no error of law or abuse of discretion with the court's analysis of the third element of Section 2511(a)(8).

We turn next to Section 2511(b), the second part of the bifurcated analysis in termination of parental rights cases. Section 2511(b) provides:

> **(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent.

23 Pa.C.S.A. § 2511(b).

The "determination of the child's particular developmental, physical, and emotional needs and welfare must be made on a case-by-case basis," but "courts should consider the matter from the child's perspective, placing her developmental, physical, and emotional needs and welfare above concerns for the parent." *In the Interest of K.T.*, 296 A.3d 1085, 1105 (Pa. 2023) (citations omitted); *see also C.M.K.*, 203 A.3d at 261-62 (the focus of Section 2511(a) is the conduct of the parent, whereas the focus of Section 2511(b) is the best interests of the child).

"The plain language of Section 2511(b) clearly mandates that, in assessing the petition to terminate parental rights, the 'primary consideration' must be the child's 'developmental, physical and emotional needs and

welfare.'" **K.T.**, 296 A.3d at 1105. It is well-established that the child's "emotional needs" and "welfare" include "intangibles such as love, comfort, security, and stability." **Id.** at 1106 (citing **T.S.M.**, 71 A.3d at 267). Our Supreme Court has held that this analysis also requires courts to consider, not only whether a child has a bond with her biological parent, but also whether the child is in a pre-adoptive foster home and whether she has a bond with her foster parents. **Id.** (citing **T.S.M.**, 71 A.3d at 268; **In re D.C.D.**, 105 A.3d 662, 677 (Pa. 2014)).

Here, the orphans' court concluded that terminating Father's parental rights was in the Child's best interest. The court explained:

> I don't find that there's [a] parent child relationship between [the Child and] either of her biological parents. She doesn't look to them to meet her needs, for care, comfort or support, by contrast those needs are being met by her resource parent. I don't believe she would suffer any irreparable harm in this case for having parental rights terminated.
>
> She has no indication that she wishes to spend any time with her parents. [B]y contrast all of her needs are met by her resource parent and she has not expressed any interest in wanting to see her parents, and has been fearful of her parents for almost a year at this point in time. [A]nd I find that the [Agency] has therefore met its burden under subsection [(b)].

N.T. at 113-14.

On appeal, Father argues that the Child lived with him for the first part of her life. Father's Brief at 18. He asserts that he consistently maintained

- 17 -

his parental bond through supervised visits until his visits were suspended. *Id.* at 18-19.

Father's argument again fails to appreciate our standard of review and is belied by the record. We must accept the orphans' court's factual findings and credibility determinations if they are supported by the record. *See T.S.M., supra*.

Here, the record supports the orphans' court's findings. The case managers testified that they did not believe there was a parent-child relationship between the Child and Father. N.T. at 42, 76. Both case managers had ruled out reunification between the Child and Father and believed that termination would not cause the Child irreparable harm. *Id.* Similarly, both case managers testified that the Child wanted to be adopted, and they believed adoption was in her best interest. *Id.* at 44-45, 79. The Child looks to her foster parent for everything, and her foster parent is willing to adopt her. *See id.* at 44, 79.

Additionally, the record belies Father's argument that he maintained his parental bond with the Child through supervised visits until his visits were suspended. In fact, as noted, visits were suspended because the Child made sexual abuse allegations against Father. The Child disclosed to the case manager that Father had sexually and inappropriately touched her in a Lowe's bathroom during one of the family's community visits. *See id.* at 30-32. The Child further disclosed that when she came out of the bathroom, she told

Mother and Maternal Grandmother, and they told her not to say things like that and that they would talk to Father. *See id.* at 32. The former case manager testified that the Child also disclosed another incident: the Child would sleep on an air mattress with Father and Mother at their home, and there were times when Father and Mother would have sexual intercourse while the Child was in the same bed. *See id.* Additionally, "then while mom would fall asleep, dad would sexually and inappropriately touch her[5] under her clothes." *Id.* The former case manager confirmed that both of those reports were indicated. *Id.*

Further, the current case manager testified that the Child was adamant that she did not want communication with her parents and felt uncomfortable and unsafe. *See id.* at 70, 76. The former case manager corroborated this by testifying that the Child never felt comfortable having visits after they were suspended, and, in fact, CUA could have set visits up if the Child felt comfortable. *See id.* at 41. The orphans' court found that the Child had been

_____

[5] We observe that it is unclear from this testimony who the case manager was referring to when she said "her" *i.e.*, whether the case manager was testifying that Father would sexually and inappropriately touch the Child or Mother after Mother fell asleep. From the context, it appears that the case manager was referring to the Child. However, Mother contests this in her brief. *See* Mother's Brief at 27 (claiming, without any citations for support, that the Child "reportedly told the case worker that [F]ather would sexually abuse [M]other in her sleep while [t]hey all shared a bed."). This discrepancy does not impact our analysis, as the Child made other sexual abuse allegations regarding Father and Mother.

fearful of her parents for almost a year at the time of the termination hearing.

*Id.* at 114. Father's challenge to Section 2511(b) merits no relief.

We now address Mother's appeal. Mother presents the following three issues for our review:

1. Did the trial court err as a matter of law and abuse its discretion in terminating Mother's parental rights under Section 2511. Further, the evidence was insufficient for the court to find, by clear and convincing evidence, to terminate Mother's rights?

2. Whether the trial court erred as a matter of law and abused its discretion where it determined that Mother relinquished her claim to the minor child and refused or failed to perform parental duties?

3. Whether the evidence was insufficient for the court to find, by clear and convincing evidence, that terminating Mother's parental rights best serves the Child's physical and emotional needs and welfare under Section 2511(b)?

Mother's Brief at 2 (cleaned up) (proposed answers omitted).

Instantly, the orphans' court terminated Mother's rights under Section 2511(a)(1), (a)(2), (a)(5), (a)(8), and (b). Again, we may affirm under any subsection of Section 2511(a). Thus, we begin with our analysis of Section 2511(a)(8), incorporating our standard of review as described above in our analysis of Father's appeal.

On appeal, Mother makes various, somewhat disjointed, arguments about why her parental rights should not have been terminated under Section 2511(a). Most of her arguments revolve around her parental capacity, her inability to perform parental duties due to lack of visitation, and that she did

not demonstrate an intent to relinquish parental responsibility. *See generally* Mother's Brief at 30-31. However, arguments related to parental duties and relinquishing parental responsibility are more relevant to Section 2511(a)(1), rather than (a)(8). *See* 23 Pa.C.S.A. § 2511(a)(1), (8). Thus, because we are analyzing (a)(8), many of Mother's arguments are irrelevant.

In fact, Mother does not specifically analyze the separate elements of any of the Section 2511(a) subsections, including (a)(8), and instead, simply makes general assertions in her argument section. Thus, we would have cause to find waiver of Mother's issues due to lack of development. *See, e.g., In re M.Z.T.M.W.*, 163 A.3d 462, 465 (Pa. Super. 2017) ("It is well-settled that this Court will not review a claim unless it is developed in the argument section of an appellant's brief, and supported by citations to relevant authority." (citation omitted)). Nevertheless, we decline to do so, and instead only address Mother's arguments that relate to a Section 2511(a)(8) analysis.

Mother broadly argues that she "made several steps toward remedying the issues which brought the case into care, and completed several objectives as evidenced by the dependency docket." Mother's Brief at 31. She also asserts that she was engaged in IDS at the time of the termination hearing, that there were hurdles to initiating IDS, and that the recommendation regarding IDS was not based upon facts which brought the case into care. *Id.* According to Mother, the only clear unresolved issue was housing. *Id.*

Mother's argument, like Father's, fails to appreciate the standard of review we must apply to termination cases. We must accept the orphans' court's factual findings and credibility determinations if they are supported by the record. *See T.S.M., supra*. This is true even if the record could support an opposite result. *See id.*

Our review of the record supports the orphans' court's decision. We again note that the Child was removed from Mother's and Father's care in March 2023; the Agency filed its termination petitions in April 2025; and the termination hearing occurred in June 2025. *See* N.T. at 23; Order of Protective Custody, 3/14/23; Termination of Parental Rights Petitions, 4/28/25. Thus, more than 12 months had elapsed since the Child's removal.

We reiterate that the Child was removed from her parents' care mainly due to concerns with the family's house, the Child not being enrolled in school, and the Child's medical needs not being met. *See* N.T. at 23.

Because the parents reside together, we incorporate our discussion of the family's house from our analysis of Father's appeal above. *See id.* at 52. The current case manager testified that housing was a big issue, and the house was still not in a condition where the Child could return to it safely as of the termination hearing. *See id.* at 62-64. CUA discussed other housing options with Mother like shelters, and, although she said she might consider moving into a shelter, there was no further discussion or progress. *See id.* at 52, 62-63. The current case manager testified that Mother was aware of the process

for her to get into a shelter. *See id.* at 63. The prior case manager also testified that Mother moved back to her home state of South Carolina for a period, during which she was unable to achieve any of her objectives. *See id.* at 52-53.

For Behavioral Health services, the former case manager testified that Mother completed intakes at two different places. *See id.* at 50. However, when the case manager left the case in January 2025, almost two years after the Child had been removed, Mother was not attending services consistently. *See id.* This remained an outstanding objective for her to complete. *Id.* On cross-examination, the current case manager testified that Mother had been in therapy since February 2025, but that began almost two years after the Child had been removed. *See id.* at 83-84.

For IDS and IQ testing, although Mother claims there were "hurdles" to initiating IDS, the former case manager testified that Mother was unable to provide some of the documentation required including copies of her Pennsylvania identification and insurance, and her vital documents. *See id.* at 53-54. Thus, the former case manager was unable to schedule Mother for IQ testing. *Id.* at 54. Similarly, the current case manager testified that she completed Mother's referral for IDS and IQ testing, but there was a delay because she asked Mother and Father for their paperwork several times, and they were not forthcoming with providing that information. *See id.* at 65-66.

Thus, contrary to Mother's argument, it appears from the record that there were other unresolved issues remaining at the time of the termination hearing, not simply housing. Further, reunification was not imminent between Mother and the Child. ***See M.E., supra***. Indeed, both case managers testified that they had ruled out reunification with Mother, and the Child could not be safely returned to Mother's care as of the termination hearing. N.T. at 55, 69-71. The Child was adamant that she did not want to communicate with her parents and was uncomfortable around them. ***See id.*** at 70. Further, the case manager testified that there had been no accountability on either parent's part as to why the Child came into care, and there was a huge lapse in mental health services. ***See id.*** She testified that Mother did not believe or agree with the reasons why the Child was taken into care. ***See id.*** at 69. Like Father, the former case manager rated Mother's compliance with her objectives as "minimal." ***Id.*** at 54-55. The case manager rated Mother's progress as "none." ***Id.*** at 55. The parenting capacity evaluator testified that, in her opinion, Mother lacked parental capacity. ***Id.*** at 18-19. Mother did not express an understanding of her contributions to the case, nor did she have a plan for how to meaningfully address those factors moving forward. ***See id.*** at 19.

Therefore, the record evidence supports a finding that the conditions which led to removal were not remedied and reunification between Mother and the Child was not imminent at the time of the termination hearing, more than

two years after the Child was removed. *See M.E., supra*. We reiterate that "a child's life cannot be held in abeyance while a parent attempts to attain the maturity necessary to assume parenting responsibilities. The court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future." *Id.* (citation omitted). We also reiterate that our role as an error-correcting appellate court does not include searching the record for contrary conclusions or substituting our judgment for that of the orphans' court. *See S.K.L.R., supra*. We discern no error of law or abuse of discretion with the orphans' court's analysis of the first two elements of Section 2511(a)(8).

Regarding the third element of Section 2511(a)(8), as explained above, the orphans' court determined that termination best served the needs and welfare of the Child.

The record supports the orphans' court's conclusion. We reiterate that the Child was in care for over two years prior to the termination hearing. We incorporate our discussion above as to why Mother's and Father's visits with the Child were suspended. CUA wanted Mother to take accountability in not reporting the sexual abuse allegations when the Child made them. *See* N.T. at 51. The case managers testified that they did not believe the Child could be safely reunified with Mother. *Id.* at 55, 69. The case managers had ruled out reunification between Mother and the Child, believed that there was no parent-child relationship between Mother and the Child, and did not feel that

the Child would experience irreparable harm from termination. *Id.* at 55-56, 70-71, 76-77. The Child did not look to Mother for safety, did not want to go home, and was adamant that she felt uncomfortable and did not want to have visits or communication with her parents. *Id.* at 55, 67, 70.

Conversely, the case managers testified that the Child had a good and healthy relationship with her foster parent, looked to the foster parent to meet her needs, and the foster parent takes her to her appointments, provides for her financially, and wanted to adopt her. *See id.* at 43-44, 78-79. Both case managers noted that the Child wanted to be adopted, and they believed adoption was in her best interest. *Id.* at 45, 79.

Thus, the record supports the orphans' court's decision that termination best served the Child's needs and welfare. We discern no error of law or abuse of discretion with the court's analysis of the third element of Section 2511(a)(8).[6]

_____

[6] Mother raised another issue in the argument section of her brief titled "Judicial Duties and Statutory safeguards." *See* Mother's Brief at 19. Within that issue, Mother challenged many aspects of the trial court's handling of this case. Mother broadly claims, among other things and without citations for support, that the court failed to: uphold the Juvenile Act's mandates and safeguards, reference her compliance at several proceedings, sufficiently consider reunification once visits were suspended, re-address the suspended visitation, and provide the terms of the initial suspension. *See id.* at 25. Mother also claims, again without citations to the record, that the court improperly: relied upon an expert's testimony, barred evidence, and took judicial notice of a mental health evaluation. *See id.* at 27-28.

*(Footnote Continued Next Page)*

_____

Mother has waived this issue because she failed to include it in her Appellate Rule 1925(b) statement or her statement of the questions involved in her brief. *See* Pa.R.A.P. 1925(b)(4)(vii) ("Issues not included in the Statement and/or not raised in accordance with the provisions of this paragraph (b)(4) are waived."); *In re M.Z.T.M.W.*, 163 A.3d 462, 466 (Pa. Super. 2017) (It "is well-settled that issues not included in an appellant's statement of questions involved and concise statement of errors complained of on appeal are waived." (citation omitted)). Further, many of Mother's arguments within this issue are not cogent, are undeveloped, and lack citation to the record or controlling authority; thus, we would also find them waived on this basis. *See, e.g., M.Z.T.M.W.*, 163 A.3d at 465 ("It is well-settled that this Court will not review a claim unless it is developed in the argument section of an appellant's brief, and supported by citations to relevant authority." (citation omitted)). Mother also fails to explain when she raised these issues before the trial court. *See* Pa.R.A.P. 302(a) ("Issues not raised in the trial court are waived and cannot be raised for the first time on appeal."). Moreover, the record belies many of Mother's assertions. *See* N.T. at 4-5, 108.

Regarding Mother's suspended visitation, we note that Mother could have appealed the order suspending her visitation as a collateral order at the time it was entered. *See Interest of L.B.*, 229 A.3d 971, 975-77 (Pa. Super. 2020) (explaining that an order suspending visits was not a final order but satisfied the requirements of the collateral order doctrine); *Interest of R.H.*, 320 A.3d 706, 711-714 (Pa. Super. 2024) (explaining that orders resulting in a complete denial of visitation were reviewable under the collateral order doctrine). Mother chose not to do so, and now the issue is moot as this case has proceeded to termination based on other sufficient record evidence. *See Interest of J.L.*, 216 A.3d 233, 237 (Pa. Super. 2019) ("As a general rule, an actual case or controversy must exist at all stages of the judicial process, or a case will be dismissed as moot." (citation omitted)). Mother also failed to explain or provide citations to the place or places in the record where she objected to her suspended visitation before the trial court. *See* Pa.R.A.P. 302(a) ("Issues not raised in the trial court are waived and cannot be raised for the first time on appeal."); *In re B.C.*, 36 A.3d 601, 605 (Pa. Super. 2012) (explaining that issues not raised before the trial court at the termination hearing were waived). Additionally, a review of the termination hearing transcript shows that she did not raise any issue, objection, or argument related to her visitation at the hearing. *See id.* Regardless, as explained within this decision, Mother's parental rights were not terminated solely based on her lack of visitation. There was ample other evidence for the court to rely on in terminating Mother's rights, and the Child was adamant about not wanting visits with Mother.

We turn next to Section 2511(b), and we incorporate our standard of review under this section as discussed above in our analysis of Father's appeal. Here, the orphans' court concluded that terminating Mother's parental rights would best serve the Child's needs and welfare.

On appeal, Mother argues that there was minimal evidence regarding the nature of her relationship with the Child. Mother's Brief at 34. Mother notes that an expert did not testify that there was no bond between Mother and the Child, that the parental duties fulfilled by the Child's caregiver were sufficient to establish a parental relationship replacing Mother's, or that the Child would not suffer harm from termination. *See id.* Mother also notes that the Child's evaluator, the Child, and the Child's caregiver did not testify. *Id.* Rather, Mother claims the orphans' court largely focused on the lack of interaction and visitations in considering the bond. *Id.* Mother claims it was not properly established that the Child's foster home was in her best interest. *See id.* Lastly, according to Mother, the court gave overweighted consideration to the parent's inability to obtain housing, contrary to Section 2511(b). *Id.*

Not only does Mother's argument again fail to appreciate the standard of review we must apply in termination cases, but it misapprehends the law and is belied by the record. Notably, Mother fails to cite evidence in the record to support any of her assertions. *See* Pa.R.A.P. 2119(c). The record reveals ample testimony regarding Mother's poor relationship with the Child. Both

case managers testified that the Child was adamant that she did not want to have communication or visits with Mother, did not want to return home, and was uncomfortable. *See* N.T. at 41, 55, 67, 70. The case managers also testified that there was no parent-child relationship between Mother and the Child, and termination would not cause the Child irreparable harm. *Id.* at 55-56, 71, 76. Further, the court found that the Child had been afraid of her parents for over a year as of the termination hearing. *Id.* at 114.

Regarding the Child's foster parent, the case managers testified that the Child's relationship with her foster parent was good, and the Child looked to her foster parent for everything. *See id.* at 43-44, 78-79. The foster parent was willing to adopt the Child, and the Child wanted to be adopted. *See id.* at 44-45, 79. The case managers concurred that adoption was in the Child's best interest. *Id.* at 45, 79.

Although Mother is technically correct that an expert witness did not testify to the above facts, the orphans' court was not required to have an expert do a bond analysis before terminating parental rights. *See In re K.K.R.-S.*, 958 A.2d 529, 533 (Pa. Super. 2008) ("In analyzing the parent-child bond, the orphans' court is not required by statute or precedent to order a formal bonding evaluation be performed by an expert." (citation omitted)). The orphans' court was well within its discretion to rely on evidence related to the bond, or lack thereof, between Mother and the Child from other witnesses. *See M.G.*, 855 A.2d at 73-74 (The "trial court is free to believe all, part, or

none of the evidence presented, and is likewise free to make all credibility determinations and resolve conflicts in the evidence." (citation omitted)).

For the same reasons, it is of no moment that the Child's evaluator, the Child, and the Child's caregiver did not testify. The Agency was free to prove its case through whichever evidence and witnesses it chose, and, if the Agency met its burden, the court was free to terminate Mother's parental rights.

We also disagree with Mother that the orphans' court largely focused on the lack of interaction and visitations between Mother and the Child when considering the bond, or lack thereof, between them. In fact, the court pointed to numerous other facts in making its Section 2511(b) determination including: the Child did not look to Mother and Father to meet her needs, or for care, comfort, or support; instead, the Child's needs were being met by her resource parent; the Child had not expressed any interest in wanting to see her parents; and the Child had been fearful of her parents for almost a year. *See* N.T. at 113-14. For the same reasons, we reject Mother's argument that it was not properly established that the Child's foster home was in her best interest. As noted, both case managers testified about the Child's foster home. Additionally, we incorporate our discussion above, rejecting the argument that the court improperly terminated the parents' rights solely based on inadequate housing in violation of Section 2511(b). Mother's challenge to Section 2511(b) merits no relief.

In sum, we hold that the orphans' court did not abuse its discretion or commit an error of law in terminating Father's and Mother's parental rights pursuant to Section 2511 of the Adoption Act. Additionally, Mother has abandoned any argument related to the goal change.

Decrees and order affirmed.

PJE Stevens joins. Judge Dubow did not participate in this decision.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 1/13/2026